Filed 5/8/14  P. v. Weeks CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>RANDALL LAWRENCE WEEKS,<br><br>          Defendant and Appellant. | C073234<br><br>(Super. Ct. No. CRF100000140) |

A jury found defendant Randall Lawrence Weeks guilty of vandalism (Pen. Code, § 594, subd. (a))[1] and found that the vandalism caused damage less than $400 (§ 594, subd. (b)(2)(A); count 1).  The jury also found defendant guilty of six counts of possession of a blank or unfinished document with intent to defraud.  (§ 475, subd. (b); counts 2 through 7.)

The trial court set aside the verdicts on counts 3 through 7 on the ground that simultaneous possession of the six documents was a single act.  (§ 7; *People v. Morelos*

---

[1] Undesignated statutory references are to the Penal Code.

1

(2008) 168 Cal.App.4th 758, 765.)  Defendant was sentenced to jail for 180 days and ordered to make restitution in an amount to be determined.

Appealing in propria persona, defendant contends (1) his vandalism conviction is not supported by sufficient evidence of the repair cost or reduction in value of the vandalized property, and (2) his document possession conviction is not supported by sufficient evidence of specific intent to complete, or facilitate the completion of, any of the unfinished money orders.  We affirm.

FACTS

*Prosecution Case-in-Chief*

A.  *Vandalism at Cache Creek Casino*

On December 15, 2009, the bill validators on NRT Technology Corporation (NRT) machine No. 19 at Cache Creek Casino were vandalized.  An NRT machine functions as an automated teller machine, ticket redemption center, and bill and coin change machine.  When a ticket (credit voucher) is inserted in to the machine's bill validators, the machine validates the ticket and dispenses cash based on the value of the ticket.

Several days after the vandalism, Cache Creek Casino Surveillance Supervisor Terry Ryan viewed surveillance video to determine how the NRT machine may have been damaged.  Ryan followed defendant's movements after the damage was done in order to determine defendant's identity.  He was tracked from the NRT machine to a podium where he presented his players' club card and obtained an adjustment of the points on his account.  The patron management activity on defendant's account corresponded to the adjustment depicted in the surveillance video.

Cache Creek Casino Slot Technical Manager Eugene Whitman repairs bill validators.  For the last couple of years at the casino, various bill validators have been damaged by liquid a few times each month.  Liquid damage requires that the machine be shut down.  Only a technician, supervisor, or manager would be qualified to decide either

2

to remove liquid-damaged bill validators from the NRT machine or to leave them in the machine to air dry. But in practice, a technician would not take the chance of turning on an NRT machine knowing that some components were wet.

Whitman reviews surveillance video depicting damage to machines to determine whether to pursue criminal charges. In Whitman's opinion, the damage caused to the machine by defendant's actions was intentional and not accidental.

Approximately three and a half hours after defendant damaged the machine, it was working again. Although casino records do not show whether the bill validators had been replaced during that period, it is most probable that new bill validators were installed. Casino policy is to replace the units and get the machine back in service as quickly as possible.

The cost estimate to replace two bill validators is $1,615. Bill validators cost approximately $750 each. Labor costs are about $65 per hour, and shipping is $50.

Four days after the vandalism, defendant again used his players' club card at the casino. Casino security contacted defendant and requested assistance from the Yolo County Sheriff's Department. Sheriff's Deputy Gary Richter viewed the portion of the surveillance video showing defendant pouring liquid into the NRT machine. Security asked Deputy Richter to arrest defendant for felony vandalism because he refused to pay for the approximately $1,600 damage to the machine.

Deputy Richter advised defendant of his constitutional rights. Defendant agreed to speak with him. Defendant admitted being at the casino on December 15, 2009. Defendant did not recall pouring liquid into the machine and said that, if he did so, it would have been an accident. Defendant had enough money to pay for the damage but not in an account to which he then had access.

Defendant admitted that he was on probation in Amador County for passing bad checks at the Jackson Rancheria Casino Resort (Jackson).

3

## B. *Safeway Money Orders*

Deputy Richter arrested defendant for vandalism and searched his person incident to the arrest. The search yielded six Safeway MoneyGram money orders that did not have payees listed. Some of the money orders had signatures and others had addresses. Three Safeway money orders for $850 listed the same address in Arizona but no purchaser or payee. Three more Safeway money orders for $950 listed "C" or "CJ" as the purchaser, had no payee, had a Safeway 1682 stamp, and, in place of the address, had an unreadable signature.

Defendant told Deputy Richter that he had received the money orders in the mail approximately a year and a half earlier from an unknown individual whom defendant believed to be "into felonious activity." Defendant also stated that he was currently employed by an Internet-based solicitation company, which he could not name, that employs him to receive money orders from individuals and then mail them out of the country. Defendant claimed he received "ten percent of all money orders mailed." After speaking about this Internet company, defendant said he intended to leave the money orders around for people to find. He described this plan as "a bad joke." He added that he did not plan on cashing the money orders because he had been involved in a case from Jackson, for which he was currently on probation, for passing bad checks.

On redirect examination, Deputy Richter testified that the Internet solicitation company was not the Chinese firm from which defendant claimed to have ordered electronic equipment.

Laurie Adragna, a Safeway payment analyst in the loss prevention department, had training and experience in determining whether Safeway money orders are counterfeit. She determined that the Safeway money orders recovered from defendant were counterfeit because: (1) they were larger in size than typical Safeway money orders; (2) the thermal dot on the face of the money orders did not change color when touched, as it should; (3) the January 29, 2008, and June 3, 2008, dates on the money

4

orders did not match the chronological date (222nd day of the year) printed at the bottom of the money orders; (4) certain fonts used on the money orders were different than the fonts Safeway uses; (5) the dollar amount on the money orders exceeded the $500 maximum for Northern California Safeway stores; (6) the store number belonged to a different division of their company--a Von's store in San Diego rather than a Safeway store; (7) the back of the money orders did not include a telephone number present on all Safeway money orders; (8) the money orders were printed at the same time by the same employee but had different dates; and (9) the serial numbers were not valid.

*Defense*

The defense rested without presenting evidence or testimony.

DISCUSSION

I

*Repair Cost or Reduction in Value*

Defendant contends his vandalism conviction is not supported by sufficient evidence because the People "did not produce any evidence that proved the reduction of value or the reasonable cost of repairing any damage that [he] allegedly caused to the personal property of the casino." (Citing *Hand Electronics, Inc. v. Snowline Joint Unified School Dist*. (1994) 21 Cal.App.4th 862, 870; *Pacific Gas & Electric Co. v. Mounteer* (1977) 66 Cal.App.3d 809, 812.) The point fails because neither reduction of value nor replacement cost is an element of defendant's offense.

Section 594, subdivision (a) provides in relevant part: "Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism: [¶] . . . [¶] (2) Damages. [¶] (3) Destroys."

Section 594, subdivision (b) provides that the offense is an alternate felony misdemeanor if the amount of damage or destruction is $400 or more and is a misdemeanor if the damage is less than $400.

5

Section 594 does not prescribe a method by which the $400 threshold is to be determined. The cases cited by defendant address alternative methods of measuring damage in civil cases and do not require a showing of reduction in value or reasonable repair cost in criminal cases brought under section 594.

The jury was instructed that the People must prove that defendant maliciously damaged or destroyed personal property of another. If the jury found defendant guilty, it "then must decide whether the People have proved that the amount of damaged [*sic*] caused by the vandalism was $400 or more."

Defendant was charged with felony vandalism, and the jury could have considered reduction of value or reasonable repair cost in the course of determining whether the $400 threshold had been reached. But the jury found that the amount of damage was less than $400, thus resolving the "amount of damage" issue in favor of defendant.

Because reduction of value and reasonable repair cost have no other relevance to defendant's conviction, we need not consider whether the evidence on those points was substantial. The only issue is whether there was sufficient evidence that defendant had maliciously damaged or destroyed the bill validators on the casino's NRT machine.

"In considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence–that is, evidence that is reasonable, credible, and of solid value– from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) In this case, the surveillance video showed defendant intending to pour, and

6

pouring, liquid into the bill validators. Whitman's testimony established that defendant's act resulted in damage to the bill validators. Whitman also established that the casino's policy was to replace the damaged units immediately because, if patrons cannot use them, the casino does not make money.

Defendant counters that the "actual damage to the bill validators was unknown and unverified." But even if the extent of physical damage was not known, the evidence showed that the units were damaged extensively enough that the casino found it necessary to replace the units with ones it knew its patrons could use.

Defendant notes that Whitman "conceded that there was no documentation made within any of the internal records of the casino showing that any bill validators were actually repaired or replaced in connection with this matter." But Whitman explained there was only a remote possibility that the wet bill validators could have become functional with the passage of time. Even though the casino log book failed to note that the bill validators had been replaced, there was sufficient evidence that technicians would not return the machine to service following the passage of a few hours knowing that the bill validators had been wet. The jury was not required to speculate that the vandalized bill validators had resumed functioning or that the machine was, in fact, undamaged. Defendant's misdemeanor vandalism conviction is supported by substantial evidence. (*Albillar, supra,* 51 Cal.4th at pp. 59-60.)

## II

### *Specific Intent to Complete Unfinished Money Order*

Defendant contends his document possession conviction is not supported by sufficient evidence that he "<u>specifically</u> <u>intended</u> to complete or facilitate the completion of any of the unfinished money orders" in his possession as required by section 475, subdivision (b). We disagree.

Section 475, subdivision (b) provides in relevant part: "Every person who possesses any blank or unfinished . . . money order, . . . whether real or fictitious, with the

7

intention of completing the same or the intention of facilitating the completion of the same, in order to defraud any person, is guilty of forgery."

The jury was instructed that the People must prove that defendant "possessed a blank or unfinished money order" and, when he possessed it, "he intended to complete or aid in the completion of the document in order to defraud."  The jury was further instructed that "someone intends to defraud if he intends to deceive another person either to cause a loss of money, goods, or services, or something else of value, or to cause damage to a legal, financial, or property right."

Specific intent to complete the money orders in order to defraud may be proved by circumstantial evidence.  (*People v. Castellanos* (2003) 110 Cal.App.4th 1489, 1493 (*Castellanos*).)  The necessary fraudulent intent may be inferred from defendant's unauthorized possession of the money orders.  (*People v. Norwood* (1972) 26 Cal.App.3d 148, 159; see *Castellanos, supra*, at pp. 1493-1494.)

Moreover, "false statements made by a defendant at the time of arrest are admissible -- not for the truth of the statements -- but to show consciousness of guilt.  As Witkin explains:  'False statements deliberately made by defendants to arresting officers concerning matters within [defendant's] own knowledge, and relating to the issue of guilt or innocence, "cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances." '  [Citation.]"  (*People v. Kimble* (1988) 44 Cal.3d 480, 496 (*Kimble*).)

In this case, the circumstances surrounding defendant's possession of the money orders support an inference of specific intent to defraud.  First, defendant had six counterfeit money orders.  None of them had payee information; as Deputy Richter explained, there were "no names on them."  In the deputy's experience, persons who use money orders have them "ready to be cashed to" the intended recipient.  Second, the money orders had as many as nine other indicators of their fraudulent nature.  Third, defendant claimed to have received the money orders a year and a half earlier, allowing

8

him abundant time to store them away. His act of bringing them to the casino supports an inference that he intended to use them there.

Defendant's conflicting and questionable statements to Deputy Richter at the time of the arrest further support an inference of specific intent to defraud. Defendant first claimed to have received the money orders from a person, whom he could not name, who was involved in felonious activity. Then he claimed to be currently employed by an Internet-based solicitation company, which he could not name, that sends him money orders that he mails out of the country.

Defendant did not claim that the unknown felon and the solicitation company were somehow related. Nor did defendant explain how he had become involved with two unrelated sources of money orders. Nor did he explain his failure to mail away the money orders recovered at the casino. His statements support an inference of consciousness of guilt. (*Kimble, supra,* 44 Cal.3d at p. 496.)

An inference of consciousness of guilt finds further support in defendant's improbable claim that he intended to use the blank money orders, not to obtain money or property for himself, but to play "a bad joke" on unsuspecting people who would find the money orders and "believe that they happened to find money." Defendant did not identify the intended targets of his "bad joke" or offer any reason for targeting them. Moreover, defendant admitted that he was on probation in Amador County for passing bad cashier's checks. Although he acknowledged that cashing the money orders would threaten his probation, he voiced no similar concern as to whether his "joking" involvement with money orders could do the same.

The jury had no duty to conclude from defendant's voiced acknowledgment of his probation status that he had no specific intent to defraud. The jury could deduce from defendant's videotaped vandalism of the bill validators that he had little or no concern for his probation status and that his status would not have deterred him from the money order offense.

9

In sum, there was sufficient circumstantial evidence of specific intent to defraud. (*Castellanos, supra,* 110 Cal.App.4th at p. 1493; *Albillar, supra,* 51 Cal.4th at pp. 59-60.)

This leaves defendant's contention regarding attempt to defraud. On cross-examination, Deputy Richter acknowledged that he had not received any report from any person or business entity of defendant attempting to defraud them by any means. Defendant's reliance on this testimony is misplaced because an attempt to use the blank or unfinished money order is not an element of the offense and need not be shown. As we have seen, the elements of the section 475, subdivision (b) offense are possession and specific intent.

DISPOSITION

The judgment is affirmed.

    BLEASE    , Acting P. J.

We concur:

    ROBIE    , J.

    BUTZ    , J.