430

PUGET SOUND POWER AND LIGHT COMPANY, *Appellant,* v.
GERALD W. STRONG, ET AL, *Respondents.*

*Charles C. Gordon, Laurie J. Kelly,* and *Perkins Coie,* for appellant.

*Frederick D. Gentry* and *Bean, Gentry & Rathbone,* for respondents.

*Walter L. Williams* on behalf of the City of Seattle and Washington Society of Municipal and PUD Attorneys, amicus curiae.

ALEXANDER, C.J.—Puget Sound Power and Light Company (Puget) appeals an order of summary judgment in favor of Gerald Strong which limited the damages Puget could recover for a utility pole destroyed by Strong. We affirm.

Strong negligently drove his automobile into one of Puget's utility poles and destroyed it. Puget, thereafter,

instituted a suit against Strong seeking damages for the cost of the replacement pole plus the cost of labor and overhead expenses incident to its replacement. Strong answered and admitted liability for the labor and overhead expenses incurred by Puget in replacing the pole but asserted, with respect to the cost of the replacement pole, that Puget was only entitled to recover the depreciated value of the pole which was destroyed.

The issue regarding the appropriate measure of damage was presented to the court by way of cross motions for summary judgment. For purposes of the motion, the parties stipulated to the following facts:

1. Puget Sound Power & Light Company (Puget) is the sole owner of the wood distribution pole involved in this litigation.

2. The wood pole involved in this litigation was installed in 1970.

3. The original cost for both the acquisition and installation of this wood pole is included in Puget's Account No. 364. The depreciation rate for this wood pole since its installation averaged 3.43%.

4. Puget's average service life of a pole, for depreciation purposes, is 31 years.

5. Washington State Utilities and Transportation Commission (WUTC) includes depreciation as an expense when deciding rate schedules for utility users.

6. Puget depreciates Account No. 364, which includes this wood pole, as an expense for tax purposes.

7. Puget's wood poles have no salvage value or retirement costs . . ..

Puget also submitted several affidavits which established, in pertinent part: The pole struck by Strong was in "good" condition; "Under a good maintenance program, a wood pole should be able to last at least 50 years or more if not affected by outside influences such as cars, lightning strikes, or decay," etc. There is no way, however, to predict how long a given pole will last in the field; "poles are also frequently removed because of factors unrelated to the condition of the pole" such as relocation of the system, transformation to an underground system, upgrading to

bigger/stronger poles, etc.; "There is no established market in which used utility poles are bought and sold"; "The account under which the wood poles are capitalized and depreciated by Puget includes other related electrical facilities such as brackets, cross–arms, transformer racks and platforms." Accordingly, the depreciation rate of 3.43 percent is with regard to a class of equipment; costs incurred in repairing poles damaged by third party negligence are accumulated and charged to a pole damage claim which is not capitalized or depreciated.

The trial court granted summary judgment to Strong, concluding that Puget was only entitled to receive, as damages for the loss of the pole, the depreciated value of the pole which was destroyed based upon the life of the utility pole as computed by Puget for tax and accounting purposes. Puget argues that the trial court erred in reaching that conclusion, contending that because there is no "market" for used utility poles it is entitled to the cost of replacement. In the alternative, Puget asserts that to the extent it is limited to the actual or depreciated value of the pole, such value should be determined in relation to the characteristics of the individual pole and should not be based upon the depreciation rate applied by it for tax and accounting purposes.

In reviewing a trial court's decision to grant summary judgment, an appellate court engages in the same inquiry as did the trial court. *Hontz v. State*, 105 Wn.2d 302, 311, 714 P.2d 1176 (1986). A motion for summary judgment should not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). In our judgment, the essential facts are not in dispute. Accordingly, the appropriate measure of damages that is to be applied is a question of law, and the case is ripe for summary judgment.

# I
## Measure of Damages

██ The measure of damages in tort actions is that indemnity which will afford an adequate compensation to a person for a loss suffered or the injury sustained by him as the direct, natural, and proximate consequences of the wrongful act or omission. *Burr v. Clark*, 30 Wn.2d 149, 158, 190 P.2d 769 (1948). The purpose of awarding damages for injury to property in a tort case is to place the injured party in the condition in which he would have been had the wrong not occurred. *Wilson v. Brand S Corp.*, 27 Wn. App. 743, 745, 621 P.2d 748 (1980), *review denied*, 95 Wn.2d 1010 (1981). A party suffering compensable injury, therefore, although entitled to be made whole, should not be allowed to duplicate his recovery. *Leader Nat'l Ins. Co. v. Torres*, 113 Wn.2d 366, 369, 779 P.2d 722 (1989).

██ We recognize that "cost of replacement" is generally stated as the appropriate measure of damages for destruction of both personal and real property where such property does not possess a market value. *See Clark*, 30 Wn.2d at 158; *Mieske v. Bartell Drug Co.*, 92 Wn.2d 40, 43, 593 P.2d 1308, 6 A.L.R.4th 923 (1979).[1] Under the circumstances of the present case, however, Puget would gain an estimated additional 14 years of service life if it were permitted to recover the cost of a new pole. Such compensation exceeds the loss incurred by Puget and, thus, would result in a windfall to Puget. We believe, therefore, that an award of replacement cost, due to the unique nature of the property at issue, would not be just. Accordingly, we decline to apply that measure of damages.[2]

---

[1]Market value is defined as "that reasonable sum of money which the property would bring on a fair sale, by a man willing to sell, but not obliged to sell, to a man willing to buy, but not obliged to buy." *McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 467, 413 P.2d 617 (1966).

[2]*See Tilly v. John Doe*, 49 Wn. App. 727, 731, 746 P.2d 323 (1987), *review denied*, 110 Wn.2d 1022 (1988) (holding, in the context of the measure of damages for the loss of a security interest, that the courts will not apply a fair market value

■ In reaching this conclusion, we reject Puget's contention that the replacement of a damaged utility pole with a new pole is no different than the replacement of a damaged taillight or bumper on a used vehicle with a new part. Puget's analogy ignores the fact that the owner of the vehicle does not gain any added benefit from the replacement of one particular part independent of the vehicle as a whole. In contrast, a utility pole has value independent of the system as a whole and, thus, Puget clearly realizes a benefit in excess of the loss incurred by the replacement of a used pole with a new pole. Accordingly, we believe the appropriate measure of damages is the actual loss incurred by Puget based upon the estimated remaining useful life of the pole destroyed of which Puget is deprived.

We recognize that our holding is contrary to that of Division Three of this court in *Washington Water Power Co. v. Miller*, 52 Wn. App. 565, 762 P.2d 16 (1988), wherein an identical claim by another tortfeasor was rejected. In reaching its conclusions, however, the court in *Miller* concluded that the burden was on the tortfeasor to prove that the pole's estimated life expectancy, as established by the utility for tax and accounting purposes, accurately reflected the life expectancy of the pole. *Miller*, 52 Wn. App. at 572. Because the defendant was unable to meet that burden, the court disallowed any offset for depreciation, concluding: "[T]he length of time this pole might have remained in the ground is pure speculation, and speculation does not provide a sufficient basis for damages." *Miller*, 52 Wn. App. at 572.

We decline to follow the holding of *Miller*. The court in *Miller*, although disallowing an offset for depreciation on the basis that it was too speculative, implicitly authorized the utility to recover on a theory which was equally speculative, namely, that the pole which was destroyed had some future life expectancy of which the utility was deprived by

---

of the collateral if the application of that measure of damages would result in a windfall to the plaintiff).

its premature destruction. A utility can just as easily be overcompensated by the award of a replacement cost measure of damages as it can be undercompensated by the application of a depreciated value measure of loss.

Given the speculative nature of both theories of recovery, we believe the court in *Miller* incorrectly placed the burden upon the defendant to prove that the new pole would provide a windfall to the utility by exceeding the remaining service life of the old pole. In our opinion, the burden correctly lies with the utility to show that the new pole would merely fulfill the remainder of the old pole's service life.

The rule regarding speculative damages cited by the court in *Miller* has always been stated in the context of *denying* damages unless they are established with reasonable certainty. *See McKernan v. Aasheim,* 102 Wn.2d 411, 419, 687 P.2d 850 (1984). Consequently, the burden of proving and segregating damages is upon the plaintiff. *See Scott v. Rainbow Ambulance Serv., Inc.,* 75 Wn.2d 494, 498, 452 P.2d 220 (1969).

As a practical matter, neither party can meet such a burden given the unpredictable forces which affect the life-span of a utility pole. In light of this dilemma, we believe the onus properly lies with the plaintiff, not the defendant. *Accord, Younger v. Appalachian Power Co.,* 214 Va. 662, 664–65, 202 S.E.2d 866, 868 (1974); *New York State Elec. & Gas Co. v. Fischer,* 43 Misc. 2d 178, 250 N.Y.S.2d 567 (1964); *Ohio Power Co. v. Zemelka,* 19 Ohio App. 2d 213, 251 N.E.2d 2 (1969); *Public Serv. Co. v. Jasso,* 96 N.M. 800, 635 P.2d 1003 (1981); *but see New Jersey Power & Light Co. v. Mabee,* 41 N.J. 439, 442, 197 A.2d 194 (1964); *Horton v. Georgia Power Co.,* 149 Ga. App. 328, 254 S.E.2d 479 (1979); *Carolina Power & Light Co. v. Paul,* 261 N.C. 710, 136 S.E.2d 103 (1964); *Mississippi Power & Light Co. v. Tillman,* 291 So. 2d 736 (Miss. 1974).

We similarly reject the contention of the City of Seattle and Washington Society of Municipal and PUD Attorneys, as set forth in their brief amicus curiae, that the Legislature, by virtue of the enactment of RCW 80.28.240, has

prescribed the application of a "replacement cost" measure of damages. RCW 80.28.240 provides, in pertinent part:

> (1) A utility may bring a civil action for damages against any person who commits, . . . or attempts to:
>
> . . . .
>
> (d) Tamper with any property owned or used by the utility to provide utility services; . . .
> (2) In any civil action brought under this section, the utility may recover from the defendant as damages three times the amount of actual damages, if any, plus the cost of the suit and reasonable attorney's fees, . . ..

Amici argue that the Legislature's reference to "actual damages" precludes an offset for depreciation. This is so, they assert, because to allow an offset for depreciation would constitute "net" damages as opposed to "actual" damages.

██ ██ The term "actual damages" is not defined by the statute. Absent a statutory definition, words of a statute must be accorded their ordinary meaning. *Davis v. Department of Empl. Sec.,* 108 Wn.2d 272, 277, 737 P.2d 1262 (1987). Statutes are also presumed to be consistent with the common law in the absence of a contrary indication from the Legislature. *State v. Bushnell,* 38 Wn. App. 809, 810–11, 690 P.2d 601 (1984).

██ The term "actual damages" is defined in Black's Law Dictionary 33 (5th ed. 1979), as being synonymous with "compensatory damages," which term is defined as:

> such as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury.

(Citations omitted.) Black's Law Dictionary 352 (5th ed. 1979).

Given the analogy to compensatory damages, and the rule of statutory construction which presumes consistency with the common law, we conclude that the term "actual damages," as it appears in the statute, does not import a rule of damages different from that prescribed by the common law. In our judgment, the appropriate measure of damages remains ". . . that indemnity which will afford an

adequate compensation for the loss suffered . . .". *Clark,* 30 Wn.2d at 158.

## II
### BASIS OF COMPUTATION

Finally, we disagree with Puget's alternative contention that the trial court erred in applying the depreciation rate used by Puget for tax and accounting purposes in order to determine the depreciated value of the pole.

Puget asserts that the depreciation rate used by it for tax and accounting purposes is not reflective of the actual depreciated value of any one pole and, thus, that the trial court erred in applying such rate as the basis for computing the pole's value. In support of this argument, Puget notes that the pole in question was stated to be in "good" condition with a potential service life of an additional 50 years *if* not affected by outside influences, etc.

Puget concedes, however, that there is no realistic way to predict how long a given pole will last in the field. As stated above, the burden of proving damages is upon the plaintiff. *Rainbow Ambulance Serv., Inc.,* 75 Wn.2d at 498. Given that the depreciation rate can work in favor of Puget as easily as against,[3] depending upon the actual remaining service life of a given pole, and that it is impossible to otherwise predict the remaining service life of a utility pole, we conclude that the trial court did not err in applying such rate as the basis for computing the depreciated value of the pole.

Affirmed.

MITCHELL, J. Pro Tem., concurs.

---

[3]To illustrate, we note that if the pole which was destroyed in the present case had in reality only a few short months of remaining service life, Puget would come out ahead in that it would recover damages representing the loss of an additional 17 years of service life, thus accounting for the total 31–year estimated service life. In contrast, had the original pole in fact had an additional 50 years of service life ahead, and were the new pole to last only a year or two, then Puget would go uncompensated for such lost service life.

REED, J. (dissenting)—I do not agree that this court should usurp the jury function and mandate that the depreciation schedule Puget Sound Power and Light Company (Puget Power) uses for accounting purposes is the sole measure of damages. Accordingly, I dissent.

From the materials considered by the trial court the following facts may be distilled: the wood pole was installed in 1970; Strong damaged the pole in 1984; Puget Power estimated that the average service life of a pole—for depreciation purposes—is 31 years; if properly maintained, a pole should last 50 or more years, unless hit by a car, struck by lightning, or injured by decay; under ideal conditions a wood pole may last indefinitely; the pole in question here was in "good" condition; there is no reasonable way to determine how long a given pole will last.

From this information the majority finds that there is no genuine issue of material fact and concludes that the proper measure of damages should be decided as a matter of law. The majority reasons as follows:

1. The appropriate measure of damages is the remaining useful life of the pole in question;

2. The useful life of the pole must be based on the depreciation schedule of 31 years;

3. Any other valuation method is too speculative because the pole could have been destroyed in some fashion before the estimated life of the pole expired.

### DAMAGES MAY BE BASED UPON REASONABLE PROBABILITIES

The majority confuses speculation with reasonable probabilities. Citing to *McKernan v. Aasheim,* 102 Wn.2d 411, 687 P.2d 850 (1984), in which parents sued a doctor arguing that they had been damaged by the birth of a healthy, normal child after an unsuccessful sterilization operation, the majority says that damages must be denied unless they are established with reasonable certainty. Majority, at 436. However, the *McKernan* court denied liability for lack of proof of the *fact* of damage, not the extent of damage. The

court did not hold that the *amount* of damage must be proved with any particular level of certainty. *See McKernan,* 102 Wn.2d at 419.

Where liability and the fact of damage are proven, damages need not be established with mathematical certainty. Instead, damages may be awarded so long as there is evidence from which the trier of fact reasonably could have arrived at the amount of damage. Thus, in *Wenzler & Ward Plumbing & Heating Co. v. Sellen,* 53 Wn.2d 96, 330 P.2d 1068 (1958), the court allowed damages for "as built" drawings and compaction of trenches, even though the exact amount of damages was not certain. The court quoted *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 90 L. Ed. 652, 66 S. Ct. 574 (1946):

> "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."

*Wenzler,* 53 Wn.2d at 99.

Similarly, in *Reefer Queen Co. v. Marine Constr. & Design Co.,* 73 Wn.2d 774, 781–82, 440 P.2d 448 (1968), the court held that the owner of a fishing vessel could recover lost profits on the basis of opinion testimony from the owner, as well as proof of results from similar vessels, even though the vessel in question did not have a prior profit history. *See also, e.g., Sigman v. Stevens–Norton, Inc.,* 70 Wn.2d 915, 425 P.2d 891 (1967); *Rasor v. Retail Credit Co.,* 87 Wn.2d 516, 531, 554 P.2d 1041 (1976).

Moreover, the court should adopt the measure of damages most beneficial to the injured party. *Marrion v. Anderson,* 36 Wn.2d 353, 355, 218 P.2d 320 (1950); *DeYoung v. Swenson,* 6 Wn. App. 452, 454, 493 P.2d 1247 (1972). The rule is not unreasonable, and the defendant need pay only so much as will make the plaintiff whole. *Kane v. Timm,* 11 Wn. App. 910, 915, 527 P.2d 480 (1974) (defendant need not pay for diminution in market value if a lesser amount will pay for replacement and make the plaintiff whole).

### BURDEN OF PROOF ON DEPRECIATION

After deciding that it is impossible to prove how long the old pole would have lasted, the majority places on Puget Power the burden of showing that the new pole will not last longer than the old pole. Majority, at 438. As support for saddling Puget Power with this impossible burden, the majority relies upon *Scott v. Rainbow Ambulance Serv., Inc.,* 75 Wn.2d 494, 452 P.2d 220 (1969) which stands for the proposition that the burden of segregating damages is upon the plaintiff. Majority, at 438. However, that case concerned segregation of damages among joint tortfeasors, and had nothing to do with determining the quantum of damages. *Scott,* 75 Wn.2d at 497.

As in any tort action, Puget Power should be required to present evidence of damage; the defendant then may present evidence that the amount should be lower because the pole is damaged, decayed or otherwise worth less than the original pole. In *V.C. Edwards Contracting Co. v. Port of Tacoma,* 83 Wn.2d 7, 514 P.2d 1381 (1973), the court allowed a partial offset, but declined to give the full offset requested because "it would seem to us incumbent upon the [defendant] to furnish the trial court with more precise figures to substantiate any claimed larger sum." *Edwards,* at 16. *Accord, Calbom v. Knudtzon,* 65 Wn.2d 157, 167, 396 P.2d 148 (1964).

### THE TRIER OF FACT SHOULD CALCULATE DAMAGES

What measure of damages will make the plaintiff whole? The majority rejects *Washington Water Power Co. v. Miller,* 52 Wn. App. 565, 762 P.2d 16 (1988), a Division Three case. There the court stated that evidence of a 35–year average useful life of a pole for accounting purposes was too speculative to provide a basis for computing damages. *Miller,* 52 Wn. App. at 572. The majority argues that the *Miller* approach improperly puts the burden of proving the pole's estimated life expectancy on the tortfeasor. Majority, at 435.

As the majority notes in its truism, at page 435, no one can prove with any degree of certainty the useful life of a particular utility pole. Because Puget Power cannot prove what the future holds, the majority then requires it to base its recovery on the estimated life used for accounting purposes. What the majority has done is to determine for itself that the depreciation schedule is the proper factual basis for determining the life of the pole.[4]

The majority is repeating the mistake made in *Younger v. Appalachian Power Co.*, 214 Va. 662, 202 S.E.2d 866 (1974), a case upon which the majority bases its conclusion that the burden of proof is upon the plaintiff. In *Younger* the court required that damages be based on the average useful life of poles in the entire transmission system:

> [1] Thus, if a pole deteriorated in normal usage was to be replaced and an automobile damaged it an hour before the replacement crew arrived with a new pole, Appalachian would gain a windfall if the tortfeasor is required to pay the full replacement costs Appalachian was about to expend. [2] On the other hand, if an automobile damaged a pole an hour after it had been replaced in the normal course of replacement, Appalachian would be less than whole if the tortfeasor is permitted to pay less than full replacement costs. [3] In each case, the actual injury sustained by Appalachian is related to the useful life of the pole.

*Younger*, 214 Va. at 664–65. Number 3 does not necessarily follow from 1 and 2. If lightning struck the pole between the time of installation and the collision 1 hour later, or if the collision split the pole, revealing decay such that the pole would have had to be replaced within 1 year, then the tortfeasor should not be required to pay the full cost of a good pole, because he did not deprive the utility of a good pole. On the other hand, if a pole is 31, 35, or 50 years old, but is still like new, then the tortfeasor should be required

---

[4]If the majority had followed its own reasoning—that it is impossible to prove the pole would have lasted any length of time—then damages should be denied completely as speculative.

to pay the replacement cost.[5] If the pole is rated between "good" and "bad", then the damages should be assessed somewhere between full value and nothing.

The approaches of both the majority and *Miller* present a false dichotomy: either the depreciation is too speculative as a matter of law (*Miller*), or depreciation is, as a matter of law the only permissible method of valuation (the majority here). There is another way: the value of the pole is a question of fact, and the depreciation schedule may be relevant evidence if it is based on facts and reasonable inferences therefrom.

I do not disagree that the depreciation schedule is a fact upon which a reasonable trier of fact could base an award of damages. The depreciation schedule is probably a good estimate of the expected life of a pole when it is first put in the ground; if the pole in question is an average pole, the schedule assumes that it will last for 31 years. However, other evidence also should be considered. The affidavit of Mr. Betzold, a staff engineer for Puget Power, included the assertion that a well maintained pole should last 50 years or more. Moreover, the estimate will change during the life of the pole: the trier of fact could have believed that the pole here was in "good" condition 14 years after it had been put in the ground and that its useful life expectancy was different from the expectancy of a pole in "almost good" or "bad" condition installed at the same time.

Thus, I would follow the reasoning of the court in *Louisiana Power & Light Co. v. Smith*, 343 So. 2d 367, 372 (La. Ct. App. 1977):

> [I]f the record clearly supports a plaintiff's contention that the cost of a new pole . . . is a particular amount, then it is the

---

[5]Though Strong does not challenge the labor costs, there is nothing to keep future defendants who hit old poles from arguing that they should pay nothing because the pole has no value, and that the utility would have been required to expend the labor to put up a new pole in any event. *See Younger,* 214 Va. at 662; *New Jersey Power & Light Co. v. Mabee,* 41 N.J. 439, 197 A.2d 194, 195 (1964).

defendant's burden to show that such amount should be reduced by applying some depreciation factor. But, again, only the particular facts of each particular case can set forth a proper basis upon which the trial court may make the ultimate determination of whether or not to allow such depreciation as an offsetting factor—and to what extent. If the defendant is able to convince the jury or the trial judge that a depreciation factor is a legitimate deductible in coming to an overall computation of the damages, then it should be allowed. . . .

What we wish to make clear is that . . . "depreciation" [is] nothing more and nothing less than [an element] in the overall order of proof of special damages. . . .

For this court to embark upon the drafting of definitive rules for the finite method of ultimate computation of damages as it has to do with replacement of telephone poles or utility poles would be as futile as to embark upon defining a finite method by which a trial judge or jury should ultimately decide how to fix damages attributable to a broken arm or a ruptured intervertebral disc. The order of proof is, by its very nature, something that can not be so totally structured as to provide a set mathematical or legalistic formula for its ultimate computation.

Another court reasoned as follows:

[T]he sundry rules for measuring damages are subordinate to the ultimate aim of making good the injury done or loss suffered and hence "The answer rests in good sense rather than in a mechanical application of a single formula."

. . . .

. . . The difficulty is that there is no discernible life expectancy of an individual pole and that although the period of 36 years is used for accounting purposes, the pole which was destroyed might well have served for a much longer period and the new pole may last for but a few years.

*New Jersey Power & Light Co. v. Mabee,* 41 N.J. at 441–42; *see also Appalachian Power Co. v. Morrison,* 152 W. Va. 638, 165 S.E.2d 809 (1969); *Carolina Power & Light Co. v. Paul,* 261 N.C. 710, 136 S.E.2d 103, 104 (1964); *Board of Pub. Utils. v. Fenton,* 669 S.W.2d 612 (Mo. App. 1984); *Hartford Elec. Light Co. v. Beard,* 3 Conn. Cir. Ct. 323, 213 A.2d 536, 538 (1965); *Horton v. Georgia Power Co.,* 149 Ga. App. 328, 254 S.E.2d 479 (1979).

Our own court recognized a similar principle in *Burr v. Clark,* 30 Wn.2d 149, 190 P.2d 769 (1948). There, the court held that the defendant could be required to pay damages

equal to the cost of a new boiler even though the boiler he destroyed had been purchased secondhand. *Burr,* at 157. The court allowed the plaintiff to recover the full cost because there was evidence that no secondhand boiler could be purchased, and that purchasing a new boiler was the cheapest method of restoring the status quo. *Burr,* at 157–58.

The amount of damages is within the discretion of the trier of fact so long as the damages are supported by substantial evidence. *Edwards,* 83 Wn.2d at 15; *Rasor,* 87 Wn.2d at 531. Even if the appellate court disagrees with the amount, it is not authorized to interfere with the verdict. *Rasor,* 87 Wn.2d at 531. We should remand for the trier of fact to determine the appropriate measure of damages.

Review granted at 116 Wn.2d 1006 (1991).